**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **LARRY RASNAKE, SR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:05-CV-236 TS** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Plaintiff Larry Rasnake, Sr., seeks judicial review of the final decision of the Defendant Commissioner of Social Security, who denied Rasnake's application under the Social Security Act for a period of disability and Disability Insurance Benefits. (DE 4.) For the following reasons, the Commissioner's final decision will be reversed and remanded for rehearing.

**A.      Procedural History**

Rasnake previously filed a claim for Disability Insurance Benefits on July 9, 2001, alleging a disability onset date of June 14, 1998; this claim was denied upon initial determination and was not appealed. On July 26, 2002, Rasnake filed a second application for the same benefits, alleging the same onset date. After this claim was denied initially and upon reconsideration, Rasnake requested an administrative hearing. On September 20, 2004, Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing at which his wife and a vocational expert testified. At the hearing, Rasnake was represented by counsel. The ALJ rendered an unfavorable decision on March 30, 2005, and the Appeals Council denied Rasnake's request for review, making the ALJ's decision the final decision of the Commissioner.

Rasnake filed a Complaint with this Court on July 19, 2005, seeking review of the Commissioner's decision, and filed his Opening Brief on November 7, 2005. The Commissioner filed its Memorandum in Support of the Commissioner's Decision on February 17, 2006, and Rasnake filed a Reply Brief on March 16, 2006.

The Court has jurisdiction to decide this matter pursuant to 42 U.S.C. § 405(g).

**B.      Factual Background**

At the time of the administrative hearing, Rasnake was fifty-three years old. He received his GED in 1991. Rasnake's past relevant work experience includes working as a machine operator and trimmer. He claims he can no longer work due to neck and shoulder injuries, arthritis, carpel tunnel syndrome, and depression.

**(1)      *Medical Evidence***

Notwithstanding Rasnake's claims that he became disabled on June 14, 1998, the medical evidence of record begins on October 5, 2000, when he was taken to the emergency room following an automobile accident. The emergency room doctor noted that, although Rasnake complained of neck pain upon palpitation, there was no obvious neck deformity or crepitus. The doctor also observed an area of swelling to the right of the thoracic spine that was tender to palpitation. In addition, the doctor noted that Rasnake's right shoulder appeared to be dislocated.[1] Other than some weakness in Rasnake's right side and a slight decrease in finger

---

[1] The x-ray technician reported that when he pulled down on Rasnake's shoulder to take a cervical spine film, he felt Rasnake's right shoulder going back into the joint.

sensation in his right hand, the doctor opined that Rasnake's arm and leg strength were relatively good. The doctor's ultimate diagnoses included probable right shoulder dislocation, cervical strain, and thoracic contusion.

Rasnake was given morphine, and the emergency room staff observed him for several hours. The doctor prescribed Lortab for Rasnake to take upon discharge, but, after Rasnake became uncooperative and abusive to the staff, he was released without the narcotic prescription and was advised to take Ibuprofen instead. At discharge, the doctor also recommended that Rasnake use a sling and swath, but he refused them.

At the request of the Social Security Administration, Rasnake visited Doctor Venkata K. Kancherla on September 14, 2001, for a physical examination. Rasnake informed Dr. Kancherla that although his neck, back, and shoulder pain began six years ago, he never went for medical treatment because he was afraid of doctors and treatments. He also told Dr. Kancherla that he went to the hospital thirteen months ago because of a motor vehicle accident but that he refused to stay for observation. Dr. Kancherla's only significant physical finding was that Rasnake's cervical spine mobility was slightly restricted secondary to pain, and he noted that the exam was "[o]therwise normal." (Tr. 117–18.)

At an appointment on May 16, 2002, with Doctor Madhav Bhat, a neurologist, Rasnake reported that he had suffered from neck and right shoulder pain since October 2000. Rasnake also explained that, since his automobile accident, he had an aching pain extending from the right side of his neck down to his upper right arm, which was aggravated by neck movements and by use of his right arm. He also complained of weakness in his right upper extremity while performing activities of daily living and reported recurrent right hand paresthesias.

On neurological examination, Dr. Bhat noted that Rasnake's strength was normal in his right biceps, triceps, and hand muscles, but he found "questionable giveaway weakness" in Rasnake's right deltoid, explaining that it was difficult to assess Rasnake's strength in his right shoulder due to superimposed pain. (Tr. 164.) Dr. Bhat also observed that Rasnake's right shoulder movements were unremarkable but that his biceps and brachial radialis reflexes were absent on the right. Opining that Rasnake's clinical symptoms were secondary to upper cervical radiculopathy, Dr. Bhat arranged an MRI of Rasnake's cervical spine.

On July 15, 2002, Rasnake visited Doctor William F. Young, a neurosurgeon, because of abnormal findings on the MRI scan. Dr. Young noted that the MRI demonstrated multi-level degenerative changes and a facet jump at the C6-7 level. After conducting a physical examination, Dr. Young concluded that Rasnake's physical symptoms might be related to this facet jump but that it did not explain all of Rasnake's complaints regarding his right arm, particularly the shoulder weakness. Dr. Young recommended further evaluation, ordering x-rays and a CT scan of Rasnake's cervical spine and an EMG of the upper right extremity.

During Rasnake's visit to Dr. Young on September 9, 2002, Dr. Young noted that the EMG study showed subacute radiculopathy involving the C5-6 and C6-7 nerve roots, that the x-rays revealed a perch facet with associated anterior displacement of C6 on C7, and that the CT scan demonstrated the facet jump as well as foraminal narrowing at C5-6 and C6-7.  Dr. Young opined that Rasnake's symptoms were related to the foraminal narrowing and the facet dislocation, which had auto-fused. He recommended a two-level foraminotomy on the right side and fusion on the left side using lateral mass plates and bone grafting. Although Dr. Young thought that this surgery was unlikely to completely correct Rasnake's spinal alignment, he

believed it would provide more room for the nerve roots. Given the long duration of Rasnake's symptoms and that his spine had auto-fused in abnormal alignment, Dr. Young's prognosis was guarded.

At the request of the Social Security Administration, Doctor Bijal Katarki examined Rasnake on October 5, 2002. Rasnake reported that the weakness in his right shoulder, pain radiating down his right arm, and reduced range of motion started in 2000 after a motor vehicle accident. He also complained of back pain, which was brought on by standing or walking for long periods of time.

After conducting a physical examination, Dr. Katarki concluded that Rasnake's daily activities were affected by shoulder pain. Specifically, Dr. Katarki noted that Rasnake was unable to pick up coins, button his shirt, open a door knob, and lift or carry more than one to two pounds of weight with his right hand. Dr. Katarki also found that Rasnake had difficulty with pushing and pulling and with prolonged sitting.

On July 10, 2003, Rasnake complained of neck pain to Doctor Donald Stallman, his family practitioner, and requested pain medication. Rasnake reported that, although Dr. Young recommended surgery, he was "currently refusing surgery." (Tr. 149.) Dr. Stallman prescribed Celebrex for Rasnake's pain.

Gilberto Perez, a social worker at the Northeastern Center, evaluated Rasnake on July 22, 2003. Rasnake reported feeling depressed, sad, and lonely. He also admitted that he had trouble getting out of his room, that he did not want to face reality, and that he had suicidal thoughts once a week. After conducting a mental status examination, Perez concluded that Rasnake exhibited major depressive symptoms, rating Rasnake's current Global Assessment of

Functioning at 50.[2] Perez recommended individual psychotherapy and an evaluation by a psychiatrist for medication.[3]

On November 4, 2003, Perez terminated Rasnake's treatment at the Northeastern Center for lack of follow through with treatment recommendations. Specifically, Perez noted that, although Rasnake visited Dr. Lipovitch for a medication evaluation on July 24, 2003, he did not show up for further appointments with Perez or Dr. Lipovitch.

Rasnake visited his new family doctor, Doctor Benito Perez, on May 12, 2004. Rasnake complained of constant, stabbing pain in his neck that radiated to his right scapula, which was aggravated by movement but was relieved by lying supine. He also reported numbness in his right hand. On physical exam, Dr. Perez noted neck tenderness, spasms, reduced rotation, and pain on movement. He also observed poor muscle tone and severely reduced range of motion in Rasnake's cervical spine. Upon examining Rasnake's right deltoid, Dr. Perez found reduced strength, decreased size, and atrophy. Finally, Dr. Perez observed no unusual anxiety or evidence of depression, although he did note that Rasnake took medication regularly for depression.

On July 14, 2004, Rasnake returned to Dr. Perez for a follow-up visit, again complaining of neck and right shoulder pain. Upon physical exam, Dr. Perez concluded that Rasnake suffered from chronic cervical radiculitis and chronic neck pain. Because Rasnake refused surgical treatment, Dr. Perez warned him of continued muscle atrophy. Finally, Dr. Perez noted that

---

[2] Global Assessment of Functioning scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A score of 50 reflects "serious symptoms" or "any serious impairments in social, occupational, or school functioning." *Id.* at 34.

[3] Interestingly, Perez also noted that Rasnake "hasn't accepted the fact that he needs neck surgery to infuse two vertebrae." (Tr. 152.)

Rasnake suffered from chronic depression and took medications, but he also observed that Rasnake's mood was not depressed and that Rasnake denied suicidal thoughts.

On September 9, 2004, Rasnake followed up again with Dr. Perez, who noted that he stopped taking medication for his depression even though it initially helped him. Upon psychiatric examination, Dr. Perez observed that Rasnake appeared anxious and had a depressed affect. Rasnake also continued to refuse surgical intervention despite Dr. Perez's warnings of further atrophy and loss of use of his right arm. Dr. Perez renewed Rasnake's prescription for pain and depression medications, advising Rasnake to follow up if he did not improve.

**(2)      Testimony at the Administrative Hearing**

At the September 20, 2004, administrative hearing, Rasnake testified that his right arm was "almost non usable," that he could lift and carry only a couple of pounds and that he had difficulty reaching because of pain and weakness. (Tr. 173.) He also testified that he had difficulties with doing anything with his right hand, specifically grasping and handling objects, because his hand was constantly numb and weak. Throughout his testimony, Rasnake indicated that his limitations with his right arm and hand have remained the same since 2001. Rasnake also testified that he had pain in his neck, right arm, and lower back. He indicated that pain medication helped but did not stop the pain, and that the only way to stop the pain was to lie down, which he did "[a]ll the time." (Tr. 179.)

Rasnake further reported that although Dr. Young "wanted to do surgeries," Rasnake "didn't get the feeling that it would work . . . [because] [f]rom what [Dr. Young] said it seems like . . . [the surgery was] not going to totally take care of the pain." (Tr. 182.) Rasnake also

7

testified that he was afraid of being paralyzed from the neck down as a result of the surgery, but he admitted that Dr. Young never told him that this was a risk. Instead, Rasnake reached this conclusion on his own: "from what I understood [Dr. Young] was going to try to fuse bones and stuff and graft bones in my neck somehow or another, and I knew that my spinal cord is in my neck in the area that the work had to be done on, and I . . . would be extremely, extremely afraid to have that done." (Tr. 182.)

Finally, Rasnake testified that he suffered from severe depression, reporting that while he began taking Lexapro over a year ago, he has seen very little results.

Rasnake's wife also testified at the hearing, reiterating that Rasnake had problems using his right arm and hand. She also indicated that Rasnake's depression was worsening, reporting that when Rasnake "gets real depressed that's when he stays in his room. He won't come out and lays on the bed a lot." (Tr. 190.)

After Rasnake and his wife testified, the ALJ posed the following hypothetical to the vocational expert:

> Assume a claimant [with] the same age, education . . . and work background as this claimant, who would be limited to light work with a stand/sit option, limited use of his right hand and arm. No fine manipulation with the right hand. No overhead work with the right hand. No lifting and carrying objects weighing over two pounds of weight and with the stand/sit option. They would be the only limitations. Would there be any work that this hypothetical individual could perform?

(Tr. 192.) The vocational expert responded that the hypothetical individual could work as a parking lot attendant, information clerk, school bus monitor, and usher. The VE further testified that there were about 125 to 300 parking lot attendant jobs, 125 to 200 information clerk jobs, 150 school bus monitor jobs, and 125 usher jobs in northeast Indiana.

The ALJ then asked whether these were just some examples of jobs that the hypothetical individual could perform, and the vocational expert answered:

> I would say that's a pretty restrictive range. I wouldn't generalize too much further than the jobs I've given because of . . . the hand and the weight and the sit/stand [limitations] so I don't think it's a representative sampling in a sense. I think we're really limited in terms of the jobs given the limitations in your hypothetical.

(Tr. 193.)

On cross examination, the vocational expert reiterated that the jobs that the hypothetical individual could perform were "severely limited." (Tr. 197.) Rasnake's attorney then asked the vocational expert, "So . . . there's not much left at [the] light, unskilled range of work," and the vocational expert replied, "That's right." (Tr. 197.) Continuing this line of questioning, Rasnake's attorney asked, "How much would you say the light range of work . . . would actually be reduced by the question the Judge asked?" The vocational expert responded, "90 to 95 percent . . . . [I]t would be a severe erosion of the light base, a marked erosion of the light base." (Tr. 198.)

### C.       Standard of Review

Section 405(g) of the Act grants the district court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The

decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### D.    Discussion

### (1)    *Legal Framework*

Under the Social Security Act, a claimant is entitled to Disability Insurance Benefits if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Rasnake is disabled as defined by the Act, the ALJ conducted a five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the

10

Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

**(2)**      ***The ALJ's Decision***

In a written decision issued on March 30, 2005, the ALJ determined that Rasnake was not disabled. The ALJ decided in Rasnake's favor on steps one and two, finding that Rasnake's arthritis, carpal tunnel syndrome, and neck and shoulder injuries were severe, but also finding that he did not meet a listing at step three. The ALJ then ascertained that Rasnake had the following RFC:

> [A] capacity for light exertional work activity with an option to sit/stand as necessary and for work activity that allows for a limited use of the right hand with no right hand fine finger manipulation, no overhead work with the right hand, and no lifting/carrying objects weighing more than 2 pounds with the right hand.

(Tr. 20.)

On the basis of this RFC, the ALJ found at step four that Rasnake was unable to perform

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

his past relevant work. Relying on the testimony of the vocational expert, the ALJ found at step

five that Rasnake was capable of performing work in the national economy as a parking lot

attendant, information clerk, school bus monitor, and usher. Therefore, Rasnake was not entitled

to a period of disability or Disability Insurance Benefits. In reaching this decision, the ALJ

concluded that Rasnake's allegations regarding his limitations were not totally credible.

Rasnake argues three grounds for reversal: (1) The ALJ's finding at step five was not

supported by substantial evidence; (2) The ALJ improperly discredited Rasnake's testimony

regarding his subjective symptoms; and (3) The ALJ failed to evaluate his alleged mental

impairment. The Court will address each argument in turn.

**(3)       *The ALJ's Step Five Determination***

Rasnake argues that, on the basis of the ALJ's RFC determination, the Medical

Vocational Guidelines, known as grids, required a finding of disabled at step five. The grids are

"a series of tables broken into separate rules 'which classif[y] a claimant as disabled or not

disabled, based on the claimant's physical capacity, age, education, and work experience.'"

*Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (quoting *Walker v. Bowen*, 834 F.2d 635,

640 (7th Cir. 1987)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a). According to the

grids, a person of Rasnake's age, education, and work experience would not be disabled if he

could perform work at the light exertional level, but he would be disabled if limited to work at

the sedentary exertional level. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 202.14, 204.14.

Here, the ALJ found that Rasnake was unable to perform the full range of light work, and

the ALJ also included in his RFC determination a sit/stand option and provided for limitations on

12

the use of Rasnake's right hand. Because Rasnake's RFC included exertional limitations falling outside the full range of light work, as well as additional nonexertional limitations, he does not match all the criteria of the rules set forth in the grids. *Haynes*, 416 F.3d at 627. Under these circumstances, use of the grids is not mandated, and it is recommended, if not required, that the ALJ move beyond the grids and consult with a vocational expert to evaluate the case. *Haynes*, 416 F.3d at 628-29 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00; SSR 83-14).

The ALJ called upon a vocational expert to testify at the administrative hearing. Although the vocational expert testified that the limitations recognized by ALJ severely restricted the number of jobs, he also indicated that there were approximately 625–775 jobs in the region that the hypothetical individual could perform. The ALJ relied on the vocational expert's numbers when determining at step five that there was a significant number of jobs in the national economy that Rasnake could perform. Instead of arguing that 625–775 jobs is not a "significant" number of jobs, Rasnake maintains that the ALJ's RFC limitations have so deteriorated the number of jobs he can perform in the light exertional category that the number is "only minutely more" than the number of jobs he could perform if he were limited to sedentary work. (Rep. Br. 9.) According to Rasnake, he was a better fit into the sedentary exertional level, and therefore the ALJ was required to find him disabled according to the grids.

Rasnake cites no Seventh Circuit case law in support of his unusual argument.[5] Indeed, the Court concludes that according to Seventh Circuit law, the ALJ did exactly what he was supposed to do in this case—consult with the vocational expert and rely on the number of jobs

---

[5] In fact, while Rasnake cites Social Security Ruling 83-12 in support of his argument, this Ruling does not mandate a finding of disabled: "[I]f the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and *could* justify a finding of 'Disabled.'" SSR 83-12 (emphasis added).

he gave as substantial evidence that Rasnake could perform work. *See Haynes*, 416 F.3d at 629–30 (finding that the ALJ committed no legal error by acting "in accord with 'the common-sense rule that where the grids do not address a particular problem, the ALJ is entitled to rely on the . . . testimony of a [vocational expert]'") (quoting *Fast v. Barnhart*, 397 F.3d 468, 472 (7th Cir. 2005)); *DeFrancesco v. Bowen*, 867 F.2d 1040, 1045 (7th Cir. 1989) (advising ALJs to "get off their grids and hear testimony by a vocational specialist concerning whether there are enough jobs that *this* claimant can *actually* do to warrant a conclusion that his medical condition is not totally disabling").

In that regard, 20 C.F.R. § 404.1566(b) provides that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." The Regulation's requirement of a "significant" number of jobs "applies to the *absolute number of jobs*." *Isaacs v. Barnhart*, 2006 WL 3240114, at *10 (S.D. Ind. Oct. 13, 2006). Accordingly, the ALJ is entitled to rely on the specific number of jobs provided by the vocational expert whose testimony "reflects a particularized evaluation of a claimant's limitations and identifies specific occupations suited to the claimant's residual functional capacity and vocational profile." *Nix v. Sullivan*, 936 F.2d 575 (7th Cir. 1991) (finding that 20 C.F.R. § 404.1566(b) was inconsistent with the claimant's proposition that the Commissioner must establish that he could perform a majority of the occupations at a given exertional level). Therefore, the ALJ committed no legal error when he determined at step five that Rasnake was

able to perform work in the national economy.[6]

However, even though the ALJ's step five determination contained no legal error, his deficient credibility determination and his failure to adequately assess Rasnake's mental condition provide Rasnake with a basis for remand.

**(4)      The ALJ's Credibility Determination**

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ discredited Rasnake because "[t]he description of the symptoms and limitations which the claimant has provided throughout the record has generally been inconsistent and unpersuasive." (Tr. 17.) Specifically, the ALJ found that Rasnake's treatment

---

[6] Rasnake argues that this conclusion "would render the rulings and regulations [a] nullity." (Rep. Br. 8.) To the contrary, the Court believes that Rasnake's position nullifies the well-established rule that an ALJ is entitled to rely on the number of jobs that the VE provides as substantial evidence. *See Gandy v. Barnhart*, 2004 WL 2481001, at *7 (N.D. Ill. Nov. 3, 2004) (citing *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) ("[Vocational expert's] testimony may constitute substantial evidence that Plaintiff can perform a significant number of jobs in the national economy.")).

"has been essentially routine or conservative in nature" and that Rasnake "was given the opportunity to relieve his discomfort and pain through surgical intervention but refused." (Tr. 18.) In addition, the ALJ discredited Rasnake on the basis of Dr. Young's July 15 opinion that Rasnake's facet jump did not explain all of his complaints regarding his right arm, suggesting that Rasnake's allegations regarding the extent of his symptoms were not supported by objective medical evidence.[7]

At the outset, the Court notes that in defending the ALJ's credibility determination, the Commissioner cites to specific examples of medical evidence that it believes conflicts with Rasnake's characterization of his limitations.[8] Furthermore, the Commissioner also claims that there are certain statements in the record made by Rasnake that conflict with each other, thus supporting the ALJ's conclusion that Rasnake was not credible.[9] However, because the ALJ did not cite to any of this evidence when rendering his credibility determination, the Commissioner's contentions are impermissible *post hoc* argument, and the Court cannot consider them. *See Wates v. Barnhart*, 288 F. Supp. 2d 947, 950 (E.D. Wis. 2003) (emphasizing that in reviewing an ALJ's decision, the court is confined to the reasons the ALJ provided and cannot supply its own reasons or rely on the Commissioner's *post hoc* rationalizations).

Rasnake first argues that the ALJ committed legal error by failing to consider his explanations for undergoing only "routine and conservative treatment" and for his refusal to

---

[7] The ALJ also discredited Rasnake's allegations of depression, which will be discussed *infra*, Part IV.D.

[8] Specifically, the Commissioner points to Dr. Katarki's examination, a clinical note from Dr. Perez, and Rasnake's alleged inconsistent use of pain medication.

[9] Specifically, the Commissioner points to allegedly conflicting reasons for why Rasnake left his job and to conflicting reports regarding the onset of Rasnake's symptoms.

have surgery. Specifically, Rasnake points to evidence in the record that he was afraid of doctors and treatment and was also afraid that surgery would leave him paralyzed and would not help relieve his pain.[10]

In that regard, when rendering a credibility determination, an ALJ is entitled to consider whether the level of a claimant's treatment is consistent with the claimant's allegations. SSR 96-7p. Furthermore, a claimant's allegations may be discredited if the claimant "is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p. However, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . [the] failure to seek medical treatment." SSR 96–7p.

Indeed, it is unclear whether the ALJ considered Rasnake's proffered reasons, as there is no discussion of them in the ALJ's credibility determination. Therefore, the ALJ committed legal error necessitating a remand. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding that an ALJ has a duty to "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability"); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) ("The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence as the statute requires him to do."). The Court has reservations,

---

[10] Rasnake also cites to various evidence that he believes demonstrates that his condition was worsening, arguing that this evidence makes "it unlikely that his refusal to follow through with treatment was due to a lack of pain as suggested by the ALJ." (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 19.) Despite Rasnake's current argument that his condition was worsening, Rasnake repeatedly testified at the administrative hearing that his limitations remained the same between 2001 and the date of the administrative hearing in 2004. These evidentiary conflicts are inappropriate for this Court to resolve here. *See Clifford*, 227 F.3d at 869.

however, regarding whether Rasnake's reasons for not undergoing the recommended surgery are indeed "good reasons" as contemplated by SSR 96–7p,[11] particularly since there appears to be little medical evidence in the record supporting his fears.[12] *See* SSR 96-7p (listing examples of "good reasons" for not seeking medical treatment); *but see Herron v. Shalala*, 19 F.3d 329, 336 n.11 (7th Cir. 1994) ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits."). But this determination is best left to the ALJ on remand. *See Clifford*, 227 F.3d at 869 (noting that the district court does not reweigh the evidence, decide questions of credibility, or substitute its judgment for the Commissioner's).

Furthermore, Rasnake's second argument in support of a remand of his credibility determination is also persuasive. In this argument, Rasnake contends that the ALJ improperly discredited him on the basis of Dr. Young's initial opinion that Rasnake's symptoms were not fully explainable, contending that additional tests ordered by Dr. Young after this July 15 visit

---

[11] SSR 96–7p provides the following examples of "good reasons" that "may provide insight into the individual's credibility":

* The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications.

* The individual's symptoms may not be severe enough to prompt the individual to seek ongoing medical attention or may be relieved with over-the-counter medications.

* The individual may not take prescription medication because the side effects are less tolerable than the symptoms.

* The individual may be unable to afford treatment and may not have access to free or low-cost medical services.

* The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.

* Medical treatment may be contrary to the teaching and tenets of the individual's religion.

[12] For example, Rasnake testified at the hearing that his fears regarding paralyzation were of his own making. Furthermore, while Rasnake maintains that Dr. Young's clinical notes support his belief that the surgery would not relieve his pain, the notes indicate only Dr. Young's opinion that surgery would not likely correct Rasnake's spinal alignment completely; Dr. Young never opined that surgery would not help alleviate Rasnake's pain. To the contrary, Dr. Young contemplates that surgery would provide more room for nerve roots, and he also encouraged Rasnake to have surgery.

18

fully explained his symptoms. While Dr. Young's September 19 clinical note does not explicitly

state that the additional tests provided a complete explanation for Rasnake's symptoms, Dr.

Young did comment that Rasnake's symptoms were "related" to a facet dislocation and the

foraminal narrowing, which suggests some additional, objective medical basis for Rasnake's

symptoms. Because the ALJ never mentioned the tests and the September 19 follow-up visit, it is

unclear whether he considered them; therefore, he did not portray the complete landscape when

he relied solely upon Dr. Young's July 15 note as the medical basis for discrediting Rasnake. *See*

*Clifford*, 227 F.3d at 871 ("[T]he ALJ did not, but should have, considered *all* relevant

evidence."); *Herron*, 19 F.3d at 333 (opining that an ALJ may not "select and discuss only that

evidence that favors his ultimate conclusion"). As a result, a remand of the ALJ's credibility

determination is warranted to correct the ALJ's omissions.[13]

---

[13]  Rasnake also suggests that the ALJ erred by failing to mention his wife's testimony, which Rasnake
believes lends support to his credibility. In that regard, although an ALJ "need not evaluate in writing every piece of
testimony and evidence submitted," when an ALJ ignores an entire line of evidence, his decision falls "below the
minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). If, however,
testimony is "redundant," an ALJ does not need to independently evaluate it, since the testimony is not a separate
line of evidence. *Id.*; *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron*, 19 F.3d at 337;
*Brandenburg v. Social Sec. Admin.*, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).
    In the cases cited above, the claimants brought essentially the same challenge that Rasnake asserts here. In
*Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the
Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily
activities" and therefore was "essentially redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980
(finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to
reiterate, and thereby corroborate, Books's own testimony concerning his activities and limitations"). In fact,
Rasnake ostensibly concedes that his wife's testimony was redundant, maintaining that "her testimony is very
important as it corroborates his testimony on the affect of the symptoms and limitations on her husband's
functioning." (Rep. Br. 6.) Accordingly, the ALJ committed no error by not specifically discussing the testimony of
Rasnake's wife.

19

**(5)**      *The ALJ's Failure to Evaluate Rasnake's Mental Impairments*

Rasnake contends that the ALJ erred by failing to evaluate his mental impairments, particularly his depression. Although the ALJ summarized the medical evidence pertaining to Rasnake's depression, he failed to evaluate this impairment according to the steps set forth in 20 C.F.R. §§ 404.1520 and 20 C.F.R. § 404.1520a. In fact, the ALJ does not even determine whether Rasnake suffered from a medically determinable mental impairment, much less evaluate whether Rasnake's depression was severe or how it affected his ability to function. *See* 20 C.F.R. § 404.1520a(b)(1) ("[W]e must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s).")

The Commissioner defends this omission by arguing that Rasnake failed to carry his burden of establishing a medically determinable mental impairment. However, because the ALJ made no mention of Rasnake's alleged mental impairments when listing Rasnake's other medically determinable impairments, the Court is left to speculate whether the ALJ indeed concluded that Rasnake did not carry his burden or whether the ALJ simply failed to consider Rasnake's alleged mental impairments at step two. *See Hemphill v. Barnhart*, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) ("[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision.").

The record provided the ALJ with ample evidence to put him on notice that an assessment of Rasnake's alleged mental impairments, namely his depression, was required under 20 C.F.R. § 404.1520a. For example, Rasnake went for an initial evaluation at the Northeastern Center for his depression, and both he and his wife testified that he suffered from depression. Furthermore, Dr. Perez's clinical notes indicate that Rasnake suffered from depression and that

he took medication for the condition. Accordingly, even if the ALJ believed that Rasnake's depression was not a medically determinable impairment, he should have written something in his opinion to that effect.[14] *See Lusher v. Barnhart*, 2004 WL 2095665, at *5 (N.D. Ill. Sept. 17, 2004) (remanding case because the ALJ failed to assess claimant's depression).

**E.     Conclusion**

In sum, the ALJ improperly discredited Rasnake because he failed to consider Rasnake's reasons for refusing surgery and did not fully account for Dr. Young's medical evidence. Furthermore, the ALJ erred by failing to assess Rasnake's alleged mental impairment. Therefore, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion. The Clerk is directed to enter a judgment in favor of Rasnake and against the Commissioner.

SO ORDERED on January 17, 2007.

    S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[14] When rendering his credibility determination, the ALJ stated that the "evidence strongly suggests that the claimant might have exaggerated his symptoms and limitations associated with his allegations of depression." (Tr. 18.) This determination, however, gives the Court no indication regarding whether the ALJ initially determined that Rasnake's depression was a medically determinable impairment, how severe his depression was, or how it affected his ability to function.